NEBRASKA PUBLIC EMPLOYEES LOCAL UNION 251 AFFILIATED
WITH THE AMERICAN FEDERATION OF STATE, COUNTY, AND
MUNICIPAL EMPLOYEES, AN INTERNATIONAL UNION, APPELLANT,
V. OTOE COUNTY, NEBRASKA, APPELLEE.

595 N.W. 2d 237

Filed June 4, 1999. No. S-98-427.

M.H. Weinberg, of Weinberg & Weinberg, P.C., for appellant.

Max J. Kelch, Otoe County Attorney, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Appellant, Nebraska Public Employees Local Union 251 affiliated with the American Federation of State, County, and Municipal Employees (Union), on behalf of three Union members, filed a petition with the Nebraska Commission of Industrial Relations (CIR). The petition alleged that the termination of the three Union members' employment by appellee, Otoe County (County), shortly after a collective bargaining agreement was signed was a prohibited practice, in violation of Neb. Rev. Stat. § 48-824(2)(a) through (d) (Reissue 1998) of the Industrial Relations Act. The CIR determined that the employment terminations were not in violation of any of the asserted subsections of § 48-824(2). The Union appeals the CIR findings regarding § 48-824(2)(a), (c), and (d). In addition, the Union asserts that the County violated the discharged Union members' federal constitutional due process rights. We granted the Union's petition to bypass and now affirm the CIR's order.

## I. ASSIGNMENTS OF ERROR

The Union assigns, reorganized, that the CIR erred (1) in failing to find that the County violated the discharged employees' constitutional due process rights as described in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985); (2) in "failing to find that a unilateral change in the terms and conditions of employment contained in the collective bargaining agreement" was a prohibited practice under § 48-824(2)(a); (3) in failing to find that the county commissioners had actual knowledge of protected union activities; (4) in finding that the law required that the county commissioners have actual knowledge of protected union activities before there can be an unfair labor practice; (5) in holding that the organizing activities of the discharged employees were too far removed in time to provide evidence of protected union activities; and (6) considering the appropriate analysis regarding timing and the county commissioner's knowledge of union activity, in failing to find that the preponderance of competent

evidence supports a finding that the County acted in violation of § 48-824(2)(c) and (d).

## II. BACKGROUND

### 1. UNION ORGANIZATION AND COLLECTIVE BARGAINING AGREEMENT NEGOTIATIONS

In December 1994, after the road department employees voted for union representation, the CIR certified the Union as the exclusive collective bargaining representative for road department employees, a total of 27 employees, excluding the 3 foremen.

On April 21, 1995, the Union petitioned the CIR to establish wages and benefits retroactively for the pay periods from July 1994 through June 1995. The Union again petitioned the CIR in January 1996 to establish wages and benefits for the pay periods from July 1995 through June 1996.

On March 12, 1996, the CIR issued an order disposing of the Union's first wage and benefit petition. As a result of the order, the County's cost increased $56,200. County Commissioner Clyde Chester Stoll testified that after receiving the order, the county commissioners first considered layoffs.

While the second wage and benefit petition was pending before the CIR, the County and the Union negotiated a collective bargaining agreement (CBA). The record reflects that at a negotiation session, Stoll told Union representatives that the County estimated the proposed CBA would immediately cost the County an additional $100,000. Stoll testified that he told Union bargaining representatives that the County would lay off four men if the CBA was signed. On April 3, 1996, the Otoe County Attorney sent Edward E. Cox, the Union's president, a letter stating that the county commissioners agreed that if the budget authority for 1996-97 remained the same, "a total of four (4) positions may be lost due to the retroactive benefits that have to be paid."

A CBA was signed and executed on April 4, 1996. Stoll stated that on that day, he told Union representatives that the County intended to lay off four people. The CIR concluded that Stoll specifically meant four bargaining unit employees. The CBA

provided that the County had "[t]he right at any time to . . . terminate jobs" and "the right to lay off at any time."

Bargaining unit members Terry Helms, Rex Bassinger, and Ervin Meyer (the discharged employees) were subsequently terminated from employment on April 19, June 14, and June 14, 1996, respectively. The County sent each a letter providing 15 days' notice and stating that the layoff was due to "budget constraints." No other County employee, bargaining unit or otherwise, was involuntarily terminated from employment.

### 2. Discharged Employees' Union Activities

Cox testified that Meyer and Helms were the individuals who initially contacted the union and set up organizational meetings. Meyer served as a Union steward during its organization through April 1995. The discharged employees all obtained union authorization cards, by which employees gave their approval to hold a representation election. All attended at least two of the first three Union meetings. All spoke in favor of union representation at the second and third Union meetings, and although Bassinger and Meyer attended the first meeting, the record is silent as to whether they voiced support at that meeting.

### 3. Proceedings Before CIR

In its petition, the Union alleged that the County knew that the discharged employees were "union organizers and adherents" and laid them off, in violation of § 48-824(2)(a) through (d). In its answer, the County denied the allegations and responded by stating that it repeatedly informed the Union during the CBA negotiations that four positions would be eliminated and that the CBA authorized the County to lay off bargaining unit members without cause.

Otoe County Highway Superintendent Robert D. Fleming and the foremen conducted performance evaluations of all the road department employees in March 1996 and presented those evaluations, ranked by score, to the county commissioners. The County did not reveal these evaluations to the discharged employees. A road department personnel policy supplement, executed in 1993, provided for employee review of and comment on individual evaluations. The discharged employees' evaluation scores were at the low end of the ranking.

The county commissioners each recommended one employee to be laid off, citing various factors such as job evaluations, lack of skills, and complaints from taxpayers.

The CIR concluded that Fleming and the foremen did not participate in the layoff process. The record reflects that Fleming and the foremen performed the March 1996 evaluations and that Fleming tabulated the results for the county commissioners. Fleming and a foreman testified that they did not recommend any individual be discharged. Richard W. Kuenning, a road department foreman, testified that he did not recommend Meyer's termination from employment, although Kuenning later testified that after the evaluation list was submitted, he recommended Meyer and two other employees (not involved in this appeal) be terminated from employment.

### 4. COUNTY'S KNOWLEDGE OF UNION ACTIVITIES

The CIR determined that the County's foremen Walter Pohlman and Kuenning knew that the discharged employees supported the union organizing effort. It determined, however, that there was no evidence that Pohlman or Kuenning relayed this knowledge to either Fleming or the county commissioners. The CIR also determined that none of the foremen knew or presumed that the discharged employees were the principal organizers of the Union. The foremen testified that they believed two other bargaining unit employees, whom the County still employs, were those responsible for organizing the Union. While Helms testified that he stated in front of the foremen that he was more involved in union organizing than Meyer, the CIR concluded that while it did not disbelieve Helms, "it is possible that the foremen simply did not hear Helms' pro-union comments."

Both Pohlman and Kuenning testified that they did not communicate their knowledge of the discharged employees' union activity to Fleming or any of the county commissioners. The county commissioners testified that they did not speak with any of the foremen regarding the discharged employees' union activity. They all denied having knowledge of the discharged employees' union activity and stated that the discharged employees' union activity thus played no part in the county commissioners' decision to lay them off.

The .CIR determined that the county commissioners knew Meyer had held the Union steward position.

### 5. COUNTY BUDGET EVIDENCE

To support its contention that budgetary considerations were not a valid reason for the employment terminations, the Union offered evidence showing that there were sufficient funds to retain the discharged employees. The CIR found that Stoll made the statement that the County had the funds to continue to employ the discharged employees and also found that County Commissioner Arlen G. Ross stated twice during CBA negotiations that money was not a problem. The County submitted evidence indicating that the CBA would create budgetary problems.

The CIR determined that the County's layoffs of the discharged employees did not violate § 48-824(2)(a), as the layoffs "were consistent with the position maintained by Otoe County during negotiations" and "do not appear to be related to the union organizing effort . . . ." As to § 48-824(2)(c), the CIR concluded that the Union failed to make a prima facie case in that it did not present evidence sufficient to support an inference that the protected conduct was a motivating factor in the County's decision to lay off the discharged employees. It determined that the layoffs did not violate § 48-824(2)(c), because "the layoffs did not occur around the time of the union organizing effort, . . . the County Commissioners were unaware of much of the protected activity" of the discharged employees, and the discharged employees' evaluations indicated that their job performance was either not acceptable or marginally acceptable. The CIR followed a similar analysis in declining to find a violation of § 48-824(2)(d). The Union appeals.

### III. SCOPE OF REVIEW

■ Our scope of review of CIR orders relating to § 48-824 violations is specifically set forth in Neb. Rev. Stat. § 48-825(4) (Reissue 1998), which states:

> Any order or decision of the commission may be modified, reversed, or set aside by the appellate court on one or more of the following grounds and no other:
>
> (a) If the commission acts without or in excess of its powers;

(b) If the order was procured by fraud or is contrary to law;

(c) If the facts found by the commission do not support the order; and

(d) If the order is not supported by a preponderance of the competent evidence on the record considered as a whole.

We have never been called upon to interpret § 48-825. We have dealt with the language set forth in clauses (a) through (c) in other contexts. However, we have never interpreted language similar to that found in clause (d).

■ We conclude that in an appeal from a CIR order regarding § 48-824 prohibited practices, concerning a factual finding, we will affirm that finding if, considering the whole record, a trier of fact could reasonably conclude that the finding is supported by a preponderance of the competent evidence. This court will consider the fact that the CIR, sitting as the trier of fact, saw and heard the witnesses and observed their demeanor while testifying and will give weight to the CIR's judgment as to credibility. See *Universal Camera Corp. v. Labor Bd.*, 340 U.S. 474, 71 S. Ct. 456, 95 L. Ed. 456 (1951) (interpreting analogous National Labor Relations Act (NLRA) § 10(f), now found at 29 U.S.C. § 160(f) (1994)).

## IV. ANALYSIS

### 1. DUE PROCESS VIOLATION; *LOUDERMILL*

The Union asserts that pursuant to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985), the County failed to provide constitutional due process to the discharged employees. It argues the County did not provide a pretermination hearing and did not provide an opportunity for the discharged employees to discuss or rebut their job evaluations prior to their discharge. The Union concludes that the CIR erred in not finding a constitutional violation, although it admits that the issue was not presented before the CIR. In *Loudermill*, the U.S. Supreme Court held that when a public employer deprives an employee of a property interest in continued employment (as first defined in *Board of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)),

constitutional due process requires that the deprivation be preceded with notice to the employee, an explanation of the employer's evidence, and an opportunity for the employee to present his or her side of the story.

The County argues that the *Loudermill* claim is not properly before this court because the Union did not assert that claim in its petition and did not address it before the CIR. However, the Union replies that constitutional due process issues are not waived if timely raised in the first judicial tribunal to review the administrative action, citing *Ashby v. Civil Serv. Comm.*, 241 Neb. 988, 492 N.W.2d 849 (1992), and that thus this court may consider the due process claim.

In *Ashby*, we stated that "procedural due process defenses should not be waived if timely raised in the first judicial tribunal to review the administrative action." *Id.* at 993, 492 N.W.2d at 853. Furthermore, we recognize that we have considered constitutional issues that were not raised until the appeal reached a court, with this court being the first forum. See *id.* We have stated that it is the practice of this court to consider constitutional questions in reviewing the orders of administrative agencies when those questions are raised in this court on direct review. *In re Appropriations D-887 and A-768*, 240 Neb. 337, 482 N.W.2d 11 (1992); *Metropolitan Utilities Dist. v. Merritt Beach Co.*, 179 Neb. 783, 140 N.W.2d 626 (1966). In effect, the constitutional issue in *Ashby* is similar to one that the Union presents here. In *Ashby*, the discharged employee asserted that his employer violated his federal constitutional due process rights when his employment was terminated. Thus, we reach the *Loudermill* claim.

To be clear, the CIR's order is properly silent on the *Loudermill* issue. The CIR "has no authority to vindicate constitutional rights." *Wood v. Tesch*, 222 Neb. 654, 659, 386 N.W.2d 436, 441 (1986), *overruled on other grounds, Landon v. Pettijohn*, 231 Neb. 837, 438 N.W.2d 757 (1989). See *Calabro v. City of Omaha*, 247 Neb. 955, 531 N.W.2d 541 (1995) (stating that Nebraska Constitution, through separation of powers provisions, prohibited CIR from declaring whether party acted in an unconstitutional manner). Therefore, the CIR did not err in failing to determine the *Loudermill* issue.

■ The Union's claim that the County denied the discharged employees due process "depends on [the discharged employees'] having had a property right in continued employment." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). Apparently, the Union presumes in making the due process argument that the discharged employees had a property interest that the federal Constitution protects. "It is well-settled that a unilateral expectation of continued employment does not create an entitlement that the due process clause protects." *Simpkins v. Sandwich Community Hosp.*, 854 F.2d 215, 218 (7th Cir. 1988). See *Board of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). "The existence of a legitimate claim of entitlement to a property interest in continued employment is to be determined in accordance with state law." *Nicholson v. Gant*, 816 F.2d 591, 597 (11th Cir. 1987). See *Loudermill, supra.*

■ " 'It is well established in Nebraska that when employment is not for a definite term, and there are no contractual or statutory restrictions upon the right of discharge, an employer may lawfully discharge an employee whenever and for whatever cause it chooses without incurring liability.' " *Blair v. Physicians Mut. Ins. Co.*, 242 Neb. 652, 656, 496 N.W.2d 483, 486 (1993). This maxim applies equally to public employees. *Myers v. Nebraska Equal Opp. Comm.*, 255 Neb. 156, 582 N.W.2d 362 (1998); *Smith v. City of Omaha*, 220 Neb. 217, 369 N.W.2d 67 (1985). If no evidence is submitted indicating the employment relationship status, a court will find that the relationship was at will. See *Smith, supra.* Finding no statute to the contrary, in order for the Union to assert a due process violation, the employment contract (the CBA) must provide for substantive restrictions upon the right of discharge. See *Loudermill, supra.*

A review of the CBA leads us to the conclusion that the employees had no protected interest in continued employment. Article 3 of the CBA provides that the Union recognize that the County has the following rights:

(g) The right at any time to determine, create, modify, and terminate jobs, job vacancies, departments, job classifications, and job duties;

. . . .

(i) The right to discipline, suspend, and discharge employees, as set forth in this contract;

(j) The right to lay off at any time.

The procedure provided to terminate an employee's employment states, in article 16: "If it becomes necessary to decrease staff or employees for any reason, including financial reasons or for reduction of work, the Supervisor or the Otoe County Commissioners may separate any employee, without prejudice, after 15 days written notice." We conclude that the CBA did not provide the discharged employees with a property interest in continued employment. Thus, the discharged employees were not entitled to the due process procedures described in *Loudermill, supra,* and the Union's assignment of error on this issue fails.

### 2. SECTION 48-824(2)(a) VIOLATION

Section 48-824(2) states in part: "It is a prohibited practice for any employer or the employer's negotiator to: (a) Interfere with, restrain, or coerce employees in the exercise of rights granted by the Industrial Relations Act."

The CIR determined that the County's layoffs of the discharged employees did not violate § 48-824(2)(a), as the layoffs "were consistent with the position maintained by Otoe County during negotiations" and "do not appear to be related to the union organizing effort." The Union does not appeal the CIR's conclusion that the layoffs did not violate § 48-824(2)(a); rather, it argues that the County's failure to provide the discharged employees an opportunity to review their job evaluations prior to being discharged was a violation of § 48-824(2)(a) because it was a unilateral change to the CBA. The County argues that the *method* of its layoffs was not before the CIR, because the method of the layoffs was not set forth as an alleged violation in the Union's petition. The County contends that this court has no jurisdiction to consider this argument. We read the County's argument as a question of whether the Union has waived the issue. Although the CIR's order discussed the evaluations, it did not address the contention that the failure to permit review of the evaluations prior to the discharges was a violation of § 48-824(2)(a).

The petition states in pertinent part:

> That on or about June 14, 1996, the [County] laid off three (3) employees in the bargaining unit represented by the [Union] who were known by the [County] to be union organizers and adherents who were instrumental in organizing the employer in order to:
>
> (a) retaliate against said employees for the exercise of their rights under the Nebraska Industrial Relations Act in violation of N.R.S. 48-824(2)(a) . . . .

The petition does not expressly allege the failure to provide pretermination review of the evaluations as a § 48-824(2)(a) violation. Rules of the Nebraska Commission of Industrial Relations 22(K) (rev. 1996) states: "The case will be tried upon the pleadings as formalized at the time of the Pretrial Conference, and no further amendments will be allowed except in cases of undue hardship, or in the furtherance of justice." No petition other than the one quoted above is presented to us in the transcript.

Proper pleading requires a petition to state in logical and legal form the facts which constitute the cause of action, define the issues to which the defendant must respond at trial, and inform the court of the real matter in dispute. See *McCurry v. School Dist. of Valley*, 242 Neb. 504, 496 N.W.2d 433 (1993). "An issue not presented to or passed on by the trial court is not appropriate for consideration on appeal." *Ashland State Bank v. Elkhorn Racquetball, Inc.*, 246 Neb. 411, 419, 520 N.W.2d 189, 194 (1994). "This court is obligated to dispose of cases on the basis of the theory presented by the pleadings on which the case was tried." *Id.*

While we recognize that the Union did not know of the evaluations until after it filed the petition in this case, an amended petition could have been filed presenting the job evaluation issue as an alleged § 48-824(2)(a) violation. The Union's pleadings did not present the issue of whether the failure to provide a pretermination review of the job evaluations was a violation of § 48-824(2)(a), and the CIR did not pass on that claim, as is evident by its order. Thus, we decline to consider this assigned error.

### 3. SECTION 48-824(2)(c) ANALYSIS

#### (a) Prima Facie Case and Burden of Proof for § 48-824(2)(c) Violation

The Union's remaining assignments of error all contest factual conclusions and legal analysis that the CIR made in relation to the alleged § 48-824(2)(c) and (d) violations. Because this court's review of § 48-824 violations is one of first impression, we first determine and set forth the proper legal framework for determining whether an employee has met his or her burden of proof and what defenses the employer has to defeat the employee's claim.

Section 48-824(2) states: "It is a prohibited practice for any employer or the employer's negotiator to: . . . (c) Encourage or discourage membership in any employee organization, committee, or association by discrimination in hiring, tenure, or other terms or conditions of employment." As stated earlier, the NLRA has provisions similar to those found in § 48-824(2). Section 8(a) of the NLRA (29 U.S.C. § 158(a) (1994)) states in part: "It shall be an unfair labor practice for an employer . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." "[D]ecisions under the NLRB [National Labor Relations Board] are helpful where there are similar provisions under the Nebraska statutes." *University Police Officers Union v. University of Nebraska*, 203 Neb. 4, 12, 277 N.W.2d 529, 535 (1979). We conclude that to the extent quoted, § 8(a)(3) of the NLRA is similar to § 48-824(2)(c), and we look to federal decisions interpreting § 8(a)(3) for guidance.

"The statutory language 'discrimination . . . to . . . discourage' means that the finding of a violation [of § 8(a)(3) of the NLRA] normally turns on whether the discriminatory conduct was motivated by an antiunion purpose." *NLRB v. Great Dane Trailers*, 388 U.S. 26, 33, 87 S. Ct. 1792, 18 L. Ed. 2d 1027 (1967). In *American Ship Bldg. v. Labor Board*, 380 U.S. 300, 311, 85 S. Ct. 955, 13 L. Ed. 2d 855 (1965), the Supreme Court stated:

> It has long been established that a finding of violation under this section will normally turn on the employer's

motivation. . . . Thus when the employer discharges a union leader who has broken shop rules, the problem posed is to determine whether the employer has acted purely in disinterested defense of shop discipline or has sought to damage employee organization.

(Citations omitted.) The NLRB and the federal courts do not require an employee's union activity to be the sole motive for a discharge in order for a violation of § 8(a)(3) to be found. To be sure, under § 8(a)(3), "if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 398, 103 S. Ct. 2469, 76 L. Ed. 2d 667 (1983). However, a violation can be found where the employer acted out of antiunion bias, " 'whether or not the [employer] may have had some other motive . . . and without regard to whether or not the [employer's] asserted motive was lawful.' " 462 U.S. at 398, quoting *Dow Chemical Co.*, 13 N.L.R.B. 993 (1939).

This interpretation of § 8(a)(3) permits a violation to be found where a " 'dual motive' " is involved, that is, where it has been shown that an unlawful motive was involved, but the employer advances a legitimate reason for the discharge and it is not shown that this reason is untrue. See *N.L.R.B. v. Thermon Heat Tracing Services*, 143 F.3d 181, 186 (5th Cir. 1998); *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced* 662 F.2d 899 (1st Cir. 1981).

In *Wright Line*, the NLRB set forth a "causation test"—the legal framework and burdens of the parties—in analyzing a § 8(a)(3) assertion where dual motives are allegedly involved. The Supreme Court approved this test in *Transportation Management Corp., supra*, and the CIR concluded that *Wright Line* provided the proper framework for its analysis of a § 48-824(2)(c) violation. First, the party asserting the violation has the burden to "make a *prima facie* showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Wright Line*, 251 N.L.R.B. at 1089. The elements commonly required to make a prima facie case of an § 8(a)(3) violation are (1) union

activity, (2) employer knowledge of that activity, (3) timing between the employees' union activity and the employer's discriminatory conduct, and (4) employer hostility or animus toward employees' union activity. *Best Plumbing Supply*, 310 N.L.R.B. 143 (1993).

The inference that protected conduct was a motivating factor must be shown by a preponderance of the evidence, and the party asserting the violation carries this burden "throughout the proceedings." *Transportation Management Corp.*, 462 U.S. at 401. See 29 U.S.C. § 160(c). Upon a prima facie showing, the employer may attempt to directly rebut the evidence supporting the prima facie case. If the employer elects not to do so or fails in the attempt to do so, the burden of proof shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected union activity. *Wright Line, supra*; *Transportation Management Corp., supra.* "It thus became clear, if it was not clear before, that proof that the discharge would have occurred in any event and for valid reasons amounted to an affirmative defense on which the employer carried the burden of proof by a preponderance of the evidence." *Transportation Management Corp.*, 462 U.S. at 400.

The NLRB now applies the *Wright Line* test to all § 8(a)(3) cases regardless of whether a case involves pretextual reasons or dual motivation. See, *Frank Black Mechanical Services*, 271 N.L.R.B. 1302 (1984); *Limestone Apparel Corp.*, 255 N.L.R.B. 722 (1981), *enforced* 705 F.2d 799 (6th Cir. 1982). "[A] finding of pretext necessarily means that the reasons advanced by the employer either did not exist or were not in fact relied upon, thereby leaving intact the inference of wrongful motive established by the [party asserting the violation]." *Limestone Apparel Corp.*, 255 N.L.R.B. at 722.

We conclude that *Wright Line* provides a satisfactory means to analyze alleged prohibited practices under § 48-824(2)(c), and we adopt *Wright Line* for that purpose. The CIR found that the discharged employees all engaged in union organizing activity as the Union asserted; thus, the Union met the first element of its prima facie case, and we advance to the second element, knowledge.

## (b) Actual Knowledge of Union Activity

The CIR made a number of factual findings regarding what knowledge of union activity the county commissioners had. Ultimately, the CIR concluded that "the County Commissioners were unaware of much of the protected activity engaged in by Bassinger, Helms and Meyer." The Union assigns this conclusion as error, asserting that direct evidence proves that the county commissioners were aware that Meyer had been a Union steward and that circumstantial evidence proves that the county commissioners knew that Helms and Bassinger were union supporters.

The CIR concluded that "all three Commissioners knew that Meyer was a union steward." That finding is supported by the record, and thus, as to Meyer, the Union has met its burden on the knowledge element of its § 48-824(2)(c) prima facie case.

The Union asserts that the county commissioners had direct knowledge of Bassinger's union activity through a conversation Bassinger had with Ross about seniority. Bassinger testified that while CBA negotiations were proceeding, he told Ross that he supported seniority protection and asked him why the county commissioners were opposed to such protection. However, Bassinger did not state that he told Ross he was a union activist. Ross testified that at no time was he aware of the extent of the discharged employees' union activities. The Union nonetheless asserts the conversation displayed Bassinger's prounion feelings. The CIR's order is silent as to this alleged conversation. With the testimony in conflict, we must presume that the CIR chose to believe Ross' testimony rather than Bassinger's. Thus, we conclude the CIR did not err in finding the county commissioners had no actual knowledge of Bassinger's union activity.

Finally, the Union asserts the County had actual knowledge of Helms' union activity because of a conversation between Helms and Ross wherein Ross stated that he had heard that attendance at the Union meetings was low and encouraged Helms to attend the meetings and vote "because that was his right as an employee." The Union asserts that the inference to be made is that Ross must have known Helms was a Union member because only Union members attend the meetings and vote. The CIR determined that this conversation took place; however,

it never concluded from that conversation that the County had knowledge of Helms' union activity. Several inferences could be made from that conversation, one of which is that Ross actually believed Helms was not a Union member and was encouraging him to join. Thus, we determine the CIR did not err in not inferring knowledge of union activity from that conversation.

### (c) Knowledge of Union Activity
### Imputed to County Commissioners

The Union asserts that even though the CIR found that the county commissioners lacked actual knowledge of some of the discharged employees' union activity, the knowledge that the foremen had must be imputed to the county commissioners. The Union argues that the CIR erred in this regard, asserting that as a matter of law, "knowledge to a supervisor is knowledge to the employer." Brief for appellant at 32.

The CIR did not expressly state that it would refuse to or that it could not impute a supervisor's knowledge to an employer. However, it rested its conclusion that the county commissioners did not know of much of the discharged employees' activities because "there is no evidence that they relayed this information to . . . Fleming or any of the . . . Commissioners."

The Union cites *Pinkerton's Inc.*, 295 N.L.R.B. 538 (1989), to support its contention that a supervisor's knowledge is always imputed to the employer. In that case, while the NLRB affirmed the administrative law judge's imputation of a supervisor's knowledge to an employer, it did so only after concluding that the employer "did not affirmatively establish such a basis for negating the judge's imputation . . . ." *Pinkerton's Inc.*, 295 N.L.R.B. at 538. That qualification is relevant here because all of the foremen expressly testified and the CIR found that they did not pass their knowledge of union activity to Fleming or the county commissioners.

This view is reflected in other NLRB precedents. In *Dr. Phillip Megdal, D.D.S., Inc.*, 267 N.L.R.B. 82 (1983), two supervisors were found to be "well acquainted with [an employee's] union organizing efforts." The administrative law judge, however, found that both supervisors credibly testified that they did not mention anything about those activities to the employer prior to the employee's discharge. The judge, having

credited both supervisors' denials, could find "no reasonable ground" on which to impute the supervisors' knowledge to the employer and thus determined the necessary knowledge of the employee's union activity was not established. *Id.* The NLRB affirmed the judge's order, stating, "[W]e will not impute knowledge of union activities where the credited testimony establishes the contrary." *Id.*

Additionally, a number of federal cases make a distinction between supervisors who had a role in the discriminatory action (here the employment terminations), as opposed to supervisors who had no role in the discriminatory action. In *Delchamps, Inc. v. N. L. R. B.*, 585 F.2d 91, 95 (5th Cir. 1978), the court rejected "the theory that the law should mechanically impute the knowledge of others" to the individual responsible for the discharge. The court distinguished impermissible imputation from permissible scenarios where either "a supervisor with such knowledge who was not nominally responsible for the firing nevertheless played a significant role in procuring the discharge" or the NLRB "has relied on circumstantial evidence to infer that the knowledge of one supervisor has been communicated" to the individual responsible for the discharge. *Id.*

The Fifth Circuit Court of Appeals reaffirmed this view in *Pioneer Natural Gas Co. v. N. L. R. B.*, 662 F.2d 408 (5th Cir. 1981), and *N.L.R.B. v. McCullough Environmental Services, Inc.*, 5 F.3d 923 (5th Cir. 1993), summarizing in *Pioneer Natural Gas Co.* that to prove a § 8(a)(3) violation, one must show that the particular supervisor responsible for the discriminatory action knew about the employee's union activities, and that while the NLRB may " 'rel[y] on circumstantial evidence to infer that the knowledge of one supervisor has been communicated' " to another supervisor, the NLRB "may not simply 'impute' the knowledge of a lower-level supervisor to the decision-making supervisor." *Pioneer National Gas Co. v. N. L. R. B.*, 662 F.2d at 412.

The Union nonetheless argues that this state's common law of agency directs the result that the foremen's knowledge must be imputed to the county commissioners. The Union cites, among other cases, *Equilease Corp. v. Neff Towing Serv.*, 227 Neb. 523, 528, 418 N.W.2d 754, 757 (1988), in which we stated:

It is the duty of an agent to communicate to his principal all the facts concerning the service in which he is engaged that come to his knowledge in the course of his employment, and this duty, in a subsequent action between his principal and a third person, he is conclusively presumed to have performed. This is the foundation of the doctrine that notice to an agent is notice to the principal.

See *City of Gering v. Smith Co.*, 215 Neb. 174, 337 N.W.2d 747 (1983). While § 275 of the Second Restatement of Agency sets forth the proposition stated in *Equilease Corp.* and *City of Gering*, a relevant exception to the proposition above is noted in the Restatement (Second) of Agency § 275, comment *b.* at 599 (1985):

If knowledge, as distinguished from reason to know, is the important element in a transaction, and the agent who has the knowledge is not one acting for the principal in the transaction, the principal is not affected by the fact that the agent has the knowledge. In many situations, in order for one to be responsible, it is necessary that the act should be done with knowledge in a subjective sense, and it is not sufficient that one has means of information.

This exception is applicable in the instant case, where, as opposed to *Equilease Corp.* and *City of Gering*, it is both the principal's act *and the principal's intent* that are at issue. A violation of § 48-824(2)(c), like a violation of § 8(a)(3) of the NLRA, "turn[s] on the employer's *motivation.*" (Emphasis supplied.) *American Ship Bldg. v. Labor Board*, 380 U.S. 300, 311, 85 S. Ct. 955, 13 L. Ed. 2d 855 (1965).

The purpose of applying the analytical exercise given in *Wright Line*, 251 N.L.R.B. 1083 (1980), is to determine whether the facts infer that union activity was a *motivating* factor in the county commissioners' decision to lay off three employees. That inquiry necessarily is concerned with the actor's subjective knowledge of union activity rather than whether the principal had reason to know because an agent to the principal knew. In short, to conclude that the rule in *Equilease Corp.* and *City of Gering* applies to the instant case would be to conclude that the foremen had a duty to inform the county commissioners of union activity—information that the law directs should not be

considered by an employer. Thus, we conclude the proposition regarding imputing an agent's knowledge to the principal found in *Equilease Corp.* and *City of Gering* is inapplicable to this case.

The CIR determined that there was no evidence that Pohlman or Kuenning communicated his knowledge of Bassinger's or Helms' union activities to either Fleming or the county commissioners. This conclusion is supported by the foremen's and the county commissioners' testimony. The CIR also concluded that the foremen did not participate in the layoff process. This conclusion is also supported by the record. However, we must qualify that finding in that Kuenning testified that upon the request of an unnamed party (presumably one of the commissioners), he selected three bargaining unit employees whom he supervised as candidates for discharge. One of them was Meyer. However, Kuenning's testimony does not alter the result, because he did not recommend Bassinger or Helms for discharge and thus played no role in their layoffs.

In conclusion, the CIR did not err in failing to impute the foremen's knowledge to the county commissioners. There was sufficient evidence to establish that the foremen did not inform the county commissioners of the discharged employees' union activities, and the record supports the CIR's finding that the foremen played no "significant role in procuring the discharge." See *Delchamps, Inc. v. N. L. R. B.*, 585 F.2d 91, 95 (5th Cir. 1978).

██ An analysis of a § 48-824(2)(c) violation ends if the county commissioners had no knowledge of any of the discharged employees' union organizing activities. "A discharge cannot stem from an improper motivation where the employer is ignorant of the employee's union activity." *Avecor, Inc. v. N.L.R.B.*, 931 F.2d 924, 931 (D.C. Cir. 1991). Having determined that the county commissioners had knowledge only of Meyer's union organizing and leadership activity, we further consider only whether Meyer's discharge was in violation of § 48-824(2)(c).

(d) Timing of Layoffs

In concluding that the reasons related to the discharges were unrelated to union activities, the CIR determined that "the lay-

offs did not occur around the time of the union organizing effort." The Union contests this finding. While the layoffs were approximately 1½ years after the Union was organized, the Union asserts that the CIR did not take into account the fact that for most of that time the County was precluded by law from terminating the employment of any employees. The Union asserts that the proper timeframe to determine the relationship between the union organizing activity and the employment terminations did not begin until April 5, 1996, when the second wage and benefit action before the CIR was dismissed.

Beginning on April 21, 1995, when the Union filed a wage and benefit action with the CIR, the County was statutorily barred from altering the status quo regarding employee status. See Neb. Rev. Stat. § 48-811 (Reissue 1998). From April 21, 1995, until April 5, 1996, there was at least one proceeding before the CIR between the County and the Union. In addition to the statutory prohibition, a CIR status quo order was in effect for much of this time, so the County would have been in contempt had it discharged any employees during that time. The employment terminations here occurred within weeks after the County was legally permitted to terminate the employment of any employees. While the County had the power to terminate the employment of union organizers from the time the Union was organized in December 1994 until April 21, 1995, it is unclear what knowledge of union activity the County had at that time, and it was only after then that the Union won a wage and benefit dispute before the CIR and pursued a status quo violation. The CIR never considered the effect of § 48-811 in concluding that the timeframe of the layoffs was too far removed. Thus, we determine that contrary to the CIR's finding, the Union met its burden to show that the timing of the employment terminations inferred an unlawful motivation.

### (e) Employer Antiunion Animus

The Union asserts that the evidence shows antiunion animus through statements that County officials made during the CBA negotiations, specifically, statements that if the CBA as proposed was signed, four bargaining unit employees would be laid off. The CIR did not expressly analyze the question of antiunion

animus, apparently relying on its findings regarding timing and knowledge to support its conclusion that the County did not violate § 48-824(2)(c). However, the CIR made specific findings regarding the conversations that the Union claims display animus. The CIR found that during CBA negotiations, Stoll stated that the County "would have to lay off four men" if the CBA was signed, and it found, which we conclude is a reasonable inference, that Stoll meant four bargaining unit employees. The Otoe County Attorney sent the Union a letter during negotiations which stated that four positions "may be lost" due to the benefits that would have to be paid.

In the context of federal labor law, "animus" is used ambiguously, sometimes meaning an employer's antiunion attitude generally and sometimes referring directly to the employer's antiunion motive in a particular case. Theodore Kheel, *Labor Law* § 12.04 (1990). Here, as the ultimate objective of applying the analysis given in *Wright Line*, 251 N.L.R.B. 1083 (1980), is to determine whether the evidence circumstantially proves that the terminations were *motivated* in part by an antiunion purpose, see *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S. Ct. 2469, 76 L. Ed. 2d 667 (1983), the Union's burden is to produce evidence of union hostility, see *W.F. Bolin Co. v. N.L.R.B.*, 70 F.3d 863 (6th Cir. 1995) (stating that express union hostility combined with knowledge of union activities may infer improper motive).

The evidence indicating hostility may arise from events not directly related to the discriminatory actions at issue and may arise from events far predating the action at issue, but the evidence must nonetheless reasonably infer a causal connection between antiunion animus and the discriminatory act. See, *Florida Steel Corp. v. N. L. R. B.*, 587 F.2d 735 (5th Cir. 1979) (concluding that NLRB, in finding violation of NLRA, impermissibly relied solely on employer's antiunion history and general bias, which had no causal connection with employee's discharge); *Monongahela Power Co.*, 324 N.L.R.B. 214 (1997) (holding that employer statements from more than 2 years prior to discriminatory act in question could be considered in determining antiunion animus); *Best Plumbing Supply*, 310 N.L.R.B. 143 (1993) (considering evidence of animus toward employees

other than one discharged). Statements of antiunion bias may be considered with the qualification that

> [t]he expressing of any view, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, is not evidence of any unfair labor practice under any of the provisions of the Industrial Relations Act if such expression contains no threat of reprisal or force or promise of benefit.

§ 48-824(4). Additionally, "under certain circumstances" animus will be inferred "in the absence of direct evidence." *Fluor Daniel, Inc.*, 304 N.L.R.B. 970 (1991) (inferring animus where employer summarily rejected 48 job applicants and all applications indicated some form of union membership, while employer consistently hired those with experience in nonunion plants).

The CIR concluded that "Otoe County hasn't exhibited hostility to the process of collective bargaining." As to the specific statements made that four men would be laid off if the CBA was signed, the CIR found that such statements supported the conclusion that the layoffs were "unrelated to their union activities," postulating that the Union had fair notice of the potential of layoffs prior to signing the CBA. We do not agree. We conclude that the CIR could not reasonably find that a preponderance of the evidence supports the finding that the County's statements during CBA negotiations did not reflect antiunion hostility. Instead, we determine that Stoll's and other County representatives' statements that four men would be laid off if the CBA was signed were threats against the Union.

 "[A]n employer is free to communicate to his employees any of his general views about unionism" and "may even make a prediction as to the precise effects he believes unionization will have on his company." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969). "In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences *beyond his control* . . . ." (Emphasis supplied.) *Id.*

> If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the

statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion . . . .

*Id.*

The County representatives' statements in negotiations that four jobs would be lost if the CBA was signed infer that the County intended to dissuade the Union from pursuing the proposed CBA by threatening retaliation against the employees that the Union represented. Those statements are proof of antiunion animus relevant to this proceeding.

Having concluded our review of the CIR's order as to the Union's prima facie case, we determine the Union sufficiently proved that Meyer engaged in Union organizing and leadership activity of which the county commissioners knew, that the timing of his employment termination was suspect, and that the County through the county commissioners held hostility toward the Union contemporaneous to Meyer's employment termination. We conclude that contrary to the CIR's findings, the Union has made a prima facie showing sufficient to infer that Meyer's union organizing activity was a motivating factor in his employment termination.

### (f) Affirmative Defense

Proof by a preponderance of the evidence that the discharge "would have occurred in any event and for valid reasons" would nonetheless preclude a finding that Meyer's employment termination was in violation of § 48-824(2)(c). See *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400, 103 S. Ct. 2469, 76 L. Ed. 2d 667 (1983). The County's asserted justification for the employment terminations was "budget constraints."

Although the CIR did not analyze the issue in terms of the affirmative defense given in *Wright Line*, 251 N.L.R.B. 1083 (1980), it thoroughly analyzed the budget evidence presented. While it found that much of the budget evidence indicated that the County could have continued the discharged employees' employment, it gave weight to the county commissioners' budget concerns and determined that percentage increases in the budget for the bargaining unit (the largest subpart of the

County's budget) created large increases in relation to the overall County budget.

As to the specific selection of Meyer for termination of employment, the CIR determined that the selection was "not without merit" and found credible the County's use of job evaluations in choosing whom to terminate. It gave weight to the most recent job evaluation as well as job evaluations conducted prior to the union organizing effort that indicated his job performance "was either not acceptable or marginally acceptable." The CIR gave weight to evidence indicating that Meyer's performance merited no pay increase for a 2-year period. It ultimately concluded that the employment terminations were a legitimate "business decision by the Otoe County Commissioners to exercise their management prerogative in choosing the level of Otoe County's budget."

Although there is contradictory evidence that the County was not suffering from budget constraints, the CIR's findings support, by a preponderance of the evidence, the conclusion that budget concerns were a legitimate reason for the employment termination and combined with Meyer's job performance would have led to Meyer's termination of employment regardless of any unlawful motivation. Thus, we affirm the CIR's order that Meyer's employment termination was not in violation of § 48-824(2)(c).

### 4. Section 48-824(2)(d) Analysis

Section 48-824(2)(d) makes it a prohibited labor practice to "[d]ischarge or discriminate against an employee because the employee has filed an affidavit, petition, or complaint or given any information or testimony under the Industrial Relations Act . . . ." As with § 48-824(2)(c), a similar provision exists within the NLRA. Section 8(a)(4) of the NLRA (29 U.S.C. § 158(a)(4)), which makes it unlawful "to discharge or otherwise to discriminate against an employee because he has filed charges or given testimony under this subchapter." A violation of § 8(a)(4), similarly to a violation of § 8(a)(3), turns on the motivation of the employer. 1 Patrick Hardin, The Developing Labor Law (3d ed. 1992). It similarly requires the court to distinguish an employer's pretextual and retaliatory

conduct from conduct motivated by legitimate business purposes, so the NLRB and the courts also apply the *Wright Line* analysis to alleged § 8(a)(4) violations. *Id.* See *Airborne Freight Corp. v. N.L.R.B.*, 728 F.2d 357 (6th Cir. 1984) (reversing NLRB finding of § 8(a)(4) violation by concluding that employer proved employee's employment would have been terminated for falsifying time records, notwithstanding evidence that employer may have also been motivated by employee's testimony to NLRB).

The Union asserts the CIR erred in finding that the County's discharge of Meyer and Bassinger did not violate § 48-824(2)(d). The CIR concluded that Meyer's employment termination was not in violation of § 48-824(2)(d) because Meyer was never asked to testify nor was he ever identified as a potential witness. Although the CIR determined that Bassinger testified in a CIR proceeding and two county commissioners knew that he did, it determined, "[F]or the reasons set forth under the analysis of § 48-824(2)(c), the Commission finds that Bassinger's testimony was not a motivating factor in Otoe County's decision to select him for layoff."

The record and the CIR's findings reflect that Bassinger testified at a CIR proceeding regarding an alleged status quo violation and that the county commissioners had direct knowledge of that activity, meeting the first two elements of the test in *Wright Line*, 251 N.L.R.B. 1083 (1980). Consistent with our determination under § 48-824(2)(c), the timing of Bassinger's employment termination was suspect, as it occurred only weeks after the County regained the ability to terminate a bargaining unit member's employment without its being in express violation of statute and a CIR status quo order. Also, the same evidence proving antiunion animus under § 48-824(2)(c) is applicable to a § 42-824(2)(d) analysis. Thus, the Union has made a prima facie showing sufficient to reasonably infer that Bassinger's act of testifying before the CIR was a motivating factor in the County's decision to terminate his employment.

However, the CIR's findings regarding the County's asserted justification for the employment terminations (budget constraints) and our analysis of those findings, set forth in our earlier § 48-824(2)(c) analysis, apply equally here as an affirmative

defense to finding a § 48-824(2)(d) violation. In addition, the County's affirmative defense argument is stronger as to Bassinger because the CIR findings reflect an additional legitimate and perhaps more compelling reason than the general budget concerns to terminate his employment. The record indicates that when the county landfill where Bassinger worked closed, rather than terminate Bassinger's position, the County created his position with the road department. Fleming testified that since that time, the County has discovered that by state law much of the work Bassinger was doing was to be the responsibility of landowners and not the County. Consistent with our conclusion under § 48-824(2)(c), the CIR's findings support the conclusion that a preponderance of the evidence shows that the County would have terminated Bassinger's employment even in the absence of his testimony before the CIR.

As to Meyer, the record does not reflect that he filed an affidavit, petition, or complaint or gave any information or testimony under the Industrial Relations Act. Thus, we agree with the CIR that, at least to the portion of § 48-824(2)(d) that the Union asserted in its petition was violated, Meyer did not engage in activity protected by that portion of § 48-824(2)(d), and thus the County did not violate § 48-824(2)(d) in terminating Meyer's employment.

## V. CONCLUSION

The County did not violate the discharged employees' constitutional due process rights as described in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). We affirm the CIR's conclusion that the County did not violate § 48-824(2)(a). We conclude, contrary to the CIR's conclusion, that the Union presented a prima facie case that Meyer's employment termination was in violation of § 48-824(2)(c) and that Bassinger's employment termination was in violation of § 48-824(2)(d). However, we affirm the CIR's conclusion that the County did not violate either § 48-824(2)(c) or (d), because we conclude that the record supports the CIR's findings that the employment terminations would have occurred regardless of any unlawful motive.

AFFIRMED.