**CENTURY ELECTRIC MOTOR COM-
PANY, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 20636.**

United States Court of Appeals,
Eighth Circuit.

Aug. 20, 1971.

Thomas M. Hanna, St. Louis, Mo., for petitioner; McMahon & Berger, St. Louis, Mo., of counsel.

Eli Nash, Jr., Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Attys., National Labor Relations Board, for respondent.

Before JOHNSEN, VOGEL and ROSS, Circuit Judges.

JOHNSEN, Senior Circuit Judge.

Century Electric Motor Company, of St. Louis, Missouri, seeks to set aside an order of the National Labor Relations Board, 180 NLRB No. 174, and the Board seeks to have the order enforced.

Century was held to have violated Section 8(a) (5) and (1) of the Act, 29 U.S.C. § 158(a) (5) and (1), in unilaterally engaging in nonpayment of a Christmas bonus for 1968, and in thereafter refusing to negotiate with the Union in regard thereto. Remedially, the Board ordered the Company to make payment of such a bonus for 1968 upon the same basis as had been done in preceding years; to cease and desist from taking any further such unilateral actions in respect to future Christmas bonuses; and to bargain collectively with the Union on any change it might desire to effect in the practice that had obtained at the plant as to the payment of such bonuses.

The plant was one located at Gettysburg, Ohio, in which small electric motors were manufactured for use in water systems. Century had purchased the plant from Tait Manufacturing Company in June, 1967. During Tait's ownership, from 1957 until the sale to Century, Tait had paid the employees a bonus each year at Christmas time. The bonus for the first two years had been upon slightly different bases, but from 1959 on they had regularly consisted of $10.00 for an employee's first year of service, plus $5.-00 for each additional year. The payments had been made, however, without any provision in the collective bargaining agreement therefor and without any express promise or agreement by Tait otherwise in respect thereto.

When Century purchased the plant, Tait advised it that the bonuses were discretionary and that the practice was subject to modification or revocation at any time. Century made an express assumption of the obligations and relationships existing under Tait's collective bargaining agreement. Although the agreement, as noted, contained no provision for any bonus, and although Century had owned the plant for only the last half of 1967, it made payment of a bonus for that year similarly as Tait had been doing.

According to the evidence, this payment was made by decision of the plant officers and not on action of the Board of Directors. When the Directors held their first meeting in 1968, they reviewed the affairs of the corporation and the actions of the officers, and the Chairman of the Board thereupon told the officers that the Company was operating at a loss and that there were to be no more

payments of Christmas bonuses until the business was making a profit.

As the end of 1968 approached, the officers, on November 27, went over the balance sheets down to October 31 and, as testified to by them, decided that they would not be entitled under the instructions given them by the Board to make payment of a Christmas bonus for that year. They called a meeting of the employees that same day and announced to them that "this had been a poor year from a sales standpoint and the income had been such that it was necessary for us to forego paying a Christmas bonus this year".

The Union and the Company had for some weeks been engaged in negotiative sessions on a new collective bargaining agreement. The previous agreement, made by Tait and assumed by Century, had an expiration date of November 8, 1968. It was stipulated at the hearing that the parties had by November 22 reached an understanding or accord on almost every major issue involved between them, and that a final session was held on December 10 at which "all remaining issues pertaining to such things as contract language, superseniority for stewards and shop classifications were agreed upon". The contract was on that date put into final form and executed.

The new agreement, like the prior one, was without any provision relating to Christmas bonuses. Further, there was included in its closing Article a "wrap-up" or "zipper" provision as follows:

"The parties acknowledged that during the negotiations which resulted in this agreement each side had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of the right and opportunity are set forth in this Agreement. Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and un- qualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement."

The bargaining committee of the Union at the negotiation sessions had consisted of three employees of the plant and the president of the Union, who was not a plant employee. All of them attended the final session on December 10, and all signed the agreement on behalf of the Union. There is no denial that in their attendance on December 10, each of them knew of the position which the Company had taken on November 27— the three employee members from having attended the announcement meeting and the Union president from having been advised thereof following the announcement.

The record shows that between the November 27 announcement and the negotiation session of December 10, the Union had on December 3 held a meeting of its members. There is no express testimony as to what took place at this meeting, but it would be only natural to suppose that a part of the meeting was devoted to going over the things upon which understanding and accord had up to that point been reached with the Company. And it would seem no less natural to presume that a part of the meeting also was devoted to a discussion of the Christmas bonus situation, an inference which has added force from the admission made by the president on the stand that one of the committee members had again spoken to him about the bonus at the meeting. One therefore would have to be credulous, indeed, to be able to believe that when the bargaining committee members came to the December 10 session and all four of them remained

completely silent about the Company's announcement, this was not done in determined strategy, but simply as deferential courtesy, in that, as the president explained it, since the plant had been paying a bonus in prior years "I would have felt like a heel * * * if I had asked them about payment of a Christmas bonus".

Concededly, the Union had the right to have raised the question at the session, to have asked to have it discussed, and to have sought to get it threshed out between them, if it had desired to do so. Manifestly, the Union did not want any negotiation on the question at the time nor to have any member of the Committee convey indication that it was in disagreement with the Company's position and that it was designing to keep this grievance card off the table and make play of it only after the bargaining session was over and the signing of the agreement had occurred. In other words, the Union was willing to have the Company believe that the new agreement with its "zipper" clause would be effecting a resolution of such differences as at least knowingly then existed between them, while its object was not to have the agreement constitute such a full good-faith attempt on its part to accomplish harmony and peace between them.

The Union waited until a week had gone by after the signing of the agreement and then served the Company with a demand that it meet and negotiate on the question of the 1968 bonus. The Company did meet with the Union but it took the position that there was nothing to negotiate as to the 1968 bonus. It inquired of the Union why, if it regarded the Company as not having had a right to take the position it had in the November 27 announcement, the Union had not indicated its disagreement by bringing the question up at the December 10 session before the new collective bargaining agreement was executed. The answer which it received from the president has been previously set out.

■■ The statutory purpose of having general collective bargaining agreements negotiated would inherently seem to be to have the parties engage in good-faith endeavor to effect as full a basis as possible for securing harmonious relations between them. This intent of the Act is not being properly served if the parties do not deal with each other in that approach and spirit in their negotiation of such an agreement. An attempt by either party in such a general negotiation to conceal and withhold some harbored grievance of which the other is not aware, in order to avoid discussion and possible fusion on it and so to keep the door open to subsequent controversy and contention between them, is not conduct which is entitled to administrative or judicial approbation, nor should it be lightly made the subject of any unrequired ancillary rewarding.

What we have said thus far has relation only to that part of the Board's order which seems to have regarded nothing improper as existing in the Union's bargaining conduct and as constituting a furtherance of the Act's purposes for the Union to be so allowed to withhold its known grievance as to the 1968 bonus and to make assertion of it after it had succeeded in getting the general agreement signed.

On the Union's concealment of its harbored grievance and its attempt to keep the question out of the dealings and accord of the parties' general collective bargaining agreement, on the Company's apparent belief of its right to not make payment of a bonus for that year, and on the Union's intended lulling of it thereon in order to get the collective bargaining agreement signed, we are not able legally to agree with the Board that "the equitable considerations, on balance, tilt in favor of" the Union and against the Company and that the Union should have its designed subsequent assertion approvingly rewarded by a summary command to the Company to make payment of the 1968 bonus.

If the Board's requirement of payment of the 1968 bonus had not involved the

context of negotiation of a general collective bargaining agreement, or if the Company's announcement of November 27 had involved any legally impermissible motivation such as a Union animosity, or if the Company's announcement as to its nonpayment of a 1968 bonus had itself not occurred until after the collective bargaining agreement was executed, we would have no difficulty in upholding the Board's payment order.

█ We agree with the statement in Beacon-Journal Publishing Co. v. N.L.R.B., 401 F.2d 366, 367 (6 Cir. 1968), that "it appears to be settled labor relations law that a regularly paid bonus [which has been without any established condition or qualification in its initiation and repetition] may come to be relied upon by employees as a part of total compensation". A bonus so paid over a period of time can on this basis properly be held to have become "wages" or "conditions of employment" within the meaning and purview of Section 8(d) of the Act, 29 U.S.C. § 158(d). See e. g. N.L.R.B. v. Niles-Bement-Pond Co., 199 F.2d 713 (2 Cir. 1952) [Christmas bonus]; N.L.R.B. v. Central-Illinois Public Service Co., 324 F.2d 916 (7 Cir. 1963) [gas-bill discount].

But the right of the Board to find that a bonus practice has come to have that status does not carry with it any automatic and absolute right in all such situations to order payment of the bonus for a particular year which the employer has on some good-faith basis, though mistakenly, withheld, without having first engaged in discussion with the Union in regard thereto. As the Court said in N.L.R.B. v. Citizens Hotel Co., 326 F.2d 501, 506 (5 Cir. 1964), "the actual nature of the failure to bargain bears significantly on the remedy to be imposed by the Board".

█ Engaging in repetition—Century had not here acted from any illegal motive, such as Union animosity. It had been led to believe in taking over the plant that Tait's bonus payments had been made under such conditions as to

have remained a discretionary matter. While it was wrong in this belief, it is to be noted that its refusal to engage in requested negotiation by the Union as to the 1968 bonus, of which the Board held it to be guilty, did not occur until after the silence and concealment of the Union at the December 10 session and the intended lulling of the Company thereby into executing the collective bargaining agreement.

In these circumstances, its refusal to pay the 1968 bonus would, we believe, after the December 10 session, more nearly come within the decisions of the Board in Tucker Steel Corporation, 134 NLRB 323 (1961) and New Orleans Board of Trade, Ltd., 152 NLRB 1253 (1963), where the Board refused to require the employer to make payment of a particular Christmas bonus. Also, we regard denial of enforcement of this aspect of the Board's order as being in accord with the holdings of General Telephone Co. of Florida v. N.L.R.B., 337 F. 2d 452 (5 Cir. 1964) and Beacon-Journal Publishing Co. v. N.L.R.B., 401 F.2d 366 (6 Cir. 1968). See also N.L.R.B. v. Citizens Hotel Co., 326 F.2d 501 (5 Cir. 1964). Further, as we have indicated, we deem it not to be gainsayable that this result will serve to further the purposes and policies of the Act in respect to the proper negotiation of general collective bargaining agreements.

We are not able, however, to agree with Century's contentions as to the rest of the Board's order—the provisions which in substance require it to cease and desist from taking any further such unilateral actions in respect to future Christmas bonuses, and to bargain with the Union on any change which it might desire to effect in the practice that had existed at the plant as to the regular payment of such bonuses. Century argues that these provisions equally should be denied enforcement.

█ We have noted that Century had not asserted in its announcement of November 27 that it was terminating the previous general practice of paying

Christmas bonuses. It merely stated that the income for 1968 had been such that it was necessary "to forego paying a Christmas bonus for the year", and it took occasion to add that, with proper effort on the part of the employees, "the profits would progress to such a degree that we should be able to pay a bonus in following years". This could hardly be regarded as involving anything except the nonpayment of the 1968 bonus. And the fact that the Company is here not being required to pay the bonus can have no possible effect upon its obligation not to engage in any future nonpayments under the established bonus practice without first informing the Union and being willing to engage in discussion thereof. Thus the Board clearly had the right to order it not to take any further such unilateral actions in regard to future bonuses.

It should be added that while the Company had predicated its November 27 announcement of nonpayment upon its 1968 earnings situation, it did not at the hearing offer any evidence in support of that justification. Thus our result has no relation to the question of the ability or inability of the Company to have paid that bonus. Further, in having set out the provisions of the "wrap-up" or "zipper" clause, we have done so only for purpose of its implicatory significance upon the concealment and witholding of a then-known and harbored grievance in the negotiation of a general collective bargaining agreement. What significance, if any, the clause may be contended to have on some matter of future controversy is a question for that controversy when it arises.

Enforcement of the Board's order as to requiring payment of the 1968 bonus is denied. Paragraph (a) of Subsection 2 of the order and Subsection 3 of the required notice are thus in effect set aside. Enforcement of the rest of the provisions of the Board's order is granted.

Enforcement granted in part and denied in part.