CRETE EDUCATION ASSOCIATION, AN UNINCORPORATED ASSOCIATION, APPELLEE, v. SALINE COUNTY SCHOOL DISTRICT NO. 76-0002, ALSO KNOWN AS CRETE PUBLIC SCHOOLS, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, APPELLANT.

654 N.W.2d 166

Filed December 13, 2002.   No. S-01-617.

Kelley Baker and Karen A. Haase, of Harding, Shultz & Downs, for appellant.

Mark D. McGuire, of McGuire and Norby, for appellee.

Robert A. Bligh for amicus curiae Nebraska Association of School Boards.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## I. INTRODUCTION

The Crete Education Association (CEA) filed a complaint against Saline County School District No. 76-0002, also known as Crete Public Schools (District), with the Commission of Industrial Relations (CIR). The CEA alleged that the District engaged in prohibited labor practices under Neb. Rev. Stat. § 48-824(2) (a), (e), and (f) (Reissue 1998). The CIR found for the CEA. The District appeals. Both the District and the CEA filed petitions to bypass the Nebraska Court of Appeals, which this court granted.

## II. FACTUAL BACKGROUND

On March 9, 2000, the CEA requested negotiations with the District regarding the terms and conditions of teacher employment for the upcoming 2000-2001 school year. The District agreed to negotiate, and negotiations began on April 19, 2000. At no time during the negotiation sessions was impasse reached or declared.

Near the time that negotiations were requested, a position for an industrial technology teacher at Crete High School became available. The District was concerned about its ability to fill this position with a qualified applicant and, accordingly, expanded its advertising for the position. Five or six applications for the position were received, but only three were deemed suitable to interview. Interviews for the three applicants were scheduled for April 3, 2000, but only two applicants were actually interviewed. The position was offered to Matthew Hintz on April 4.

Prior to offering the position to Hintz, Kim Sheppard, principal of Crete High School, discussed the results of the interview process with Dr. John Fero, superintendent of the District. Sheppard expressed concern over whether Hintz would accept the offer, given the $21,000 yearly salary. Due to Sheppard's concern, Dr. Fero authorized Sheppard to offer Hintz a starting salary of $24,000, an amount which Dr. Fero testified he felt would be within the range of the base salary after the negotiations between the District and the CEA were completed for the 2000-2001 school year.

At the District's school board meeting held April 10, 2000, the District approved the hiring of Hintz. While the minutes of

that board meeting do not reflect the $24,000 starting salary, there was testimony that the board did discuss the amount of the starting salary at that meeting. The meeting was attended by Chad Denker, past president of the CEA, as well as Jana Fulton, president of the CEA during the relevant negotiations. The record reflects that at this meeting, the board "opened up the floor" for general public comment, but none was made. When Hintz signed his contract on April 27, the salary amount was left blank pending the upcoming negotiations.

Negotiations between the CEA and the District commenced on April 19, 2000, with a goal to formulate a collective bargaining agreement for the 2000-2001 school year. Each side was represented by a negotiating team. Representing the District were Dr. Fero, then school board president Dr. Gary Lothrop, and chief negotiator Gary Williams, who was also a school board member. Representing the CEA were Denker, Fulton, Jennene Puchalla, and chief negotiator Mike Coe.

At this first meeting, one of the issues raised by the CEA was the salary to be paid some of the new teachers. In addressing this issue, Dr. Fero noted that Hintz had been promised $24,000, but had signed a blank contract.

The next three negotiation sessions took place between May 3 and June 14, 2000. The District made five different offers during these sessions, with an effective base salary ranging from $23,661 to $24,826. The CEA's proposals made during these negotiations included base salaries of $21,900 to $22,200.

A fifth and final negotiation meeting was held on August 8, 2000. At this meeting, the District presented its sixth proposal which included, in effect, a base salary of $23,716. The CEA countered with their sixth proposal, which included a base salary of $21,700. At this juncture, the District questioned why the CEA did not favor an increase in the base salary. According to the minutes of that session:

> Mike Coe explained CEA wanted to keep the current index. There is not a board policy that he is aware of that prohibits them [the District] from giving a bonus, because it would not affect the salary index.
>
> The entire CEA Negotiations team does not agree with giving a non-experienced teacher any extra steps.

The District then presented its seventh proposal, which included a base salary of $21,650. In response to Fulton's concern about the low base salary for the upcoming year, the minutes reflect that the District's business manager "stated that the CEA told them to give a bonus." The minutes further reflect that "Mike Coe explained again that there is no board policy which prevents the board from giving a bonus, but that the Negotiation Team did not endorse or approve of it."

The District's seventh proposal was approved by the membership of the CEA. This agreement contained, inter alia, a base salary of $21,650, but made no mention of signing bonuses. On August 30, 2000, however, the District and Hintz entered into a separate agreement to make up the difference between the $24,000 promised contract price and the $21,650 base price through the payment of a bonus.

The CEA learned of this separate agreement, and on November 16, 2000, filed suit in the CIR pursuant to the Nebraska Industrial Relations Act (NIRA), Neb. Rev. Stat. §§ 48-801 to 48-842 (Reissue 1998). The CEA alleged that the District had engaged in prohibited labor practices in violation of § 48-824(2)(a), (e), and (f) by refusing to bargain with respect to the " 'signing bonuses,' " by "dealing directly" with Hintz, and by unilaterally repudiating the salary schedule in the parties' negotiated agreement.

A hearing was held before the CIR on February 1, 2001. District superintendent Dr. Fero's testimony reflected that the District had made six proposals prior to the proposal which the CEA accepted and that all six proposals included a base salary at or near $24,000. Dr. Fero further testified that the District felt it was necessary to raise the base salary in order to attract new teachers and remain competitive with other districts. He then testified that after the District had expressed concern over the low base salary, the CEA responded by informing them that there was nothing in law or policy to prevent the District from paying a bonus, but that the CEA did not endorse or approve of it. Dr. Fero testified that he took these statements to mean that the CEA was "saying it's okay to pay bonuses" and further, that the District had changed its negotiating position in reliance on the CEA's apparent willingness to allow the payment of signing bonuses. He stated that the District would not have agreed to a

base salary of $21,650 without a "clear agreement" that it could pay a signing bonus to Hintz.

Dr. Lothrop, president of the District's school board during the time of the relevant negotiations, testified that the impetus for the school board's change in position regarding the desire for a $24,000 base was the fact that the beginning of the school year was fast approaching and that the District wanted a new agreement before the new school year began. He testified that "settling [this agreement] before school I don't think anybody would disagree in this room is in the best interest of the teachers, the board, the administration and the students." He similarly testified that he felt the CEA had agreed to the use of a bonus as a solution to the District's low base salary problem.

Coe, chief negotiator for the CEA, testified that the minutes were accurate in recording his statement that "there is no board policy which prevents the board from giving a bonus." However, he explained that he felt the minutes did not adequately express his emphasis that the CEA did not endorse or approve the idea of paying a bonus. He testified that he felt he had been clear in communicating that the CEA was not endorsing or approving the use of bonuses.

Fulton, on behalf of the CEA, testified that at the first negotiation meeting on April 19, 2000, Denker raised the issue of paying Hintz $24,000, but that Hintz' name did not come up in the discussions after that time. Fulton further testified recalling discussions on paying bonuses, but contended that those discussions occurred only in the last session and not throughout the negotiations and that she believed the CEA's opposition to the payment of bonuses to be clear.

Puchalla testified that it was her belief that the District intended to pay Hintz $24,000 regardless of how the negotiations proceeded. Puchalla further testified that she believed Coe was clear in communicating the CEA's position that it did not approve of the use of a signing bonus.

The CIR entered its order on May 1, 2001, finding that by directly communicating with Hintz in April 2000 regarding his base salary of $24,000, and in August 2000 regarding his signing, the District engaged in impermissible direct dealing in violation of § 48-824(2)(a), (e), and (f). The CIR further found that

payment of $2,350 in the form of a signing bonus, per the August 2000 agreement, was in violation of the collective bargaining agreement and § 48-824(2)(a) and (e).

The CIR further concluded that the CEA had not waived its right to object to the signing bonuses, nor had it waived its right to file a claim with the CIR by failing to first file a grievance pursuant to the negotiated agreement. Finally, the CIR found that the parol evidence rule prevented the consideration of any statements relating to the use of signing bonuses in an attempt to reform the final negotiated bargaining agreement.

The CIR granted several remedies to the CEA. First, while it allowed the District to pay Hintz the disputed signing bonus for the 2000-2001 school year, it ordered the District to cease and desist from paying that bonus after August 1, 2001. The District was further ordered to cease and desist from the payment of any signing bonuses or other compensation which would otherwise be the subject of mandatory bargaining and was not contained in a negotiated agreement. In addition, the District was ordered to cease and desist from deviating from the negotiated agreement and to cease and desist from directly dealing with its represented employees on matters which constituted terms and conditions of employment. Finally, the District was ordered to post notices explaining that it had engaged in prohibited labor practices and would not do so again in the future. The District appealed.

### III. ASSIGNMENTS OF ERROR

The District assigns, restated, that the CIR erred in (1) failing to find that the CEA negotiated in bad faith thereby "bar[ring] it from litigating . . . the issue of a signing bonus"; (2) refusing to consider parol evidence in the course of negotiations between the CEA and the District pertaining to the payment of signing bonuses; (3) finding that the District engaged in direct dealing; (4) failing to find that the CEA had "waived its right" to complain about the District's payment of a bonus by failing to file a grievance pursuant to the negotiated agreement; and (5) entering declaratory and injunctive relief, which exceeded "the commission's limited statutory authority and is, therefore, contrary to law."

## IV. STANDARD OF REVIEW

██ Our scope of review of CIR orders relating to § 48-824 violations is specifically set forth in § 48-825(4), which states:

> Any order or decision of the commission may be modified, reversed, or set aside by the appellate court on one or more of the following grounds and no other:
>
> (a) If the commission acts without or in excess of its powers;
>
> (b) If the order was procured by fraud or is contrary to law;
>
> (c) If the facts found by the commission do not support the order; and
>
> (d) If the order is not supported by a preponderance of the competent evidence on the record considered as a whole.

See *Nebraska Pub. Emp. v. Otoe Cty.*, 257 Neb. 50, 595 N.W.2d 237 (1999).

██ In an appeal from a CIR order regarding § 48-824 prohibited practices, concerning a factual finding, we will affirm that finding if, considering the whole record, a trier of fact could reasonably conclude that the finding is supported by a preponderance of the competent evidence. This court will consider the fact that the CIR, sitting as the trier of fact, saw and heard the witnesses and observed their demeanor while testifying and will give weight to the CIR's judgment as to credibility. *Id.*

## V. ANALYSIS

### 1. BAD FAITH

In its first assignment of error, the District asserts the CIR erred in failing to find the CEA negotiated in bad faith. The District contends the CEA acted in bad faith by first suggesting the payment of bonuses and then filing suit in the CIR when that course of action was followed. According to the District, Coe's statement that there was "no board policy which prevents" the District from paying a bonus waived any right the CEA had to complain about the District's payment of a signing bonus to Hintz.

The District relies on *Century Electric Motor Company v. N. L. R. B.*, 447 F.2d 10 (8th Cir. 1971), decided under the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.

(2000), for the proposition that it is bad faith for a union to remain silent on an issue of possible contention and then sue after an agreement is finalized. See, *Nebraska Pub. Emp. v. Otoe Cty., supra*; *University Police Officers Union v. University of Nebraska*, 203 Neb. 4, 277 N.W.2d 529 (1979) (determining that cases decided under NLRA can be helpful in interpreting NIRA, but are not binding).

In *Century Electric Motor Company v. N. L. R. B., supra*, an employer announced to its employees in late November 1968 that it would be unable to pay a Christmas bonus that year. At the time the announcement was made, the employer was involved in negotiations with the employees' union. On December 10, the two sides met to finalize their bargaining agreement. Though the members of the union's negotiating team were aware that there would be no Christmas bonuses that year, they did not complain about that fact at the final negotiating session. One week after a new agreement was finalized, the union attempted to force the employer to negotiate over the Christmas bonus for that year. When the employer refused, the union sued, arguing that since the bonus was a wage, hour, term, or condition of employment, the employer could not unilaterally withdraw it. The court rejected the union's argument, stating:

> The statutory purpose of having general collective bargaining agreements negotiated would inherently seem to be to have the parties engage in good-faith endeavor to effect as full a basis as possible for securing harmonious relations between them. This intent of the [NLRA] is not being properly served if the parties do not deal with each other in that approach and spirit in their negotiation of such an agreement. An attempt by either party in such a general negotiation to conceal and withhold some harbored grievance of which the other is not aware, in order to avoid discussion and possible fusion on it and so to keep the door open to subsequent controversy and contention between them, is not conduct which is entitled to administrative or judicial approbation, nor should it be lightly made the subject of any unrequired ancillary rewarding.

*Century Electric Motor Company v. N. L. R. B.*, 447 F.2d at 13.

*Century Electric Motor Company* is distinguishable. In the case before us, the CIR found:

> The record reveals that there were no false representations or concealment of material facts on the part of the Association. On the contrary, the Association in negotiations with the District clearly stated that while the Association's representative could find no board policy which prevented the district from giving a bonus, the Association did not endorse or approve of such bonuses. We find no evidence in the record that this representation was false, nor do we find that the Association tried to conceal any policy.

It is clear from the record that the discussions between the District and the CEA concerning wages, hours, and other terms and conditions of employment included a dialog regarding signing bonuses. The parties, however, dispute the manner in which this dialog was resolved. The District maintains it left the final negotiating session on August 8, 2000, thinking it could pay bonuses, based in part upon the August 8 minutes wherein Coe is recorded to have said that "[t]here is not a board policy that he [Coe] is aware of that prohibits them from giving a bonus . . . ." The CEA, on the other hand, maintains it left believing it had made its opposition to bonuses clear, also relying, in part, on the August 8 minutes wherein it is further recorded that "Mike Coe explained again that there is no board policy which prevents the board from giving a bonus but that the Negotiation Team did not endorse or approve of it."

The issue before us on appeal is not whether there was evidence to support the District's claim, but whether, considering the whole record, a trier of fact could reasonably conclude that the finding is supported by a "preponderance of competent evidence." *Nebraska Pub. Emp. v. Otoe Cty.*, 257 Neb. 50, 53-54, 595 N.W.2d 237, 245 (1999). Accord § 48-825(4)(d). Based upon our review of the record, we determine that the CIR's findings on the issue of bad faith were supported by a preponderance of competent evidence, were within the scope of the CIR's statutory authority, and were not contrary to law. Accordingly, the District's first assignment of error is without merit.

## 2. PAROL EVIDENCE

In its second assignment of error, the District argues that the CIR erred in refusing to consider parol evidence regarding the course of negotiations between the CEA and the District. The District first contends this evidence should have been considered to show that (1) the CEA negotiated in bad faith, (2) the issue of signing bonuses was "actually negotiated," and (3) the signing bonus agreement supplemented the negotiated agreement and was not parol evidence. Brief for appellant at 18. Assuming, without deciding, the CIR erred in failing to admit some evidence related to the course of negotiations, we nonetheless conclude that a substantial amount of evidence regarding the purported relationship between signing bonuses and the negotiation process was received and considered by the CIR.

At the hearing before the CIR, Dr. Fero was asked by one of the District's attorneys whether there was anything that was not expressed in the written negotiated agreement that he believed to be a part of the agreement. The CEA made a parol evidence objection. The following exchange between one of the District's attorneys and the CIR judge then took place:

[CIR judge:] Are you — so you are asking for an interpretation of this? Or —

[District's counsel:] No, sir. No. I — I can approach it differently by asking him what happened in negotiations. And we'll get to the same end.

[CIR judge:] I am concerned about the parol evidence rule as altering or seeking to interpret an otherwise unambiguous document. We haven't talked about whether this is ambiguous or not. If you can get it, what you're getting at in a different way, I think it would be better.

I will sustain the objection on the basis of the parol evidence rule and allow you to proceed.

At that point, Dr. Fero proceeded to relate the chronology of the negotiations between the parties, including statements regarding the payment of bonuses:

[District's counsel:] Okay. Now, let's go to August 8th of 2000, the negotiating session, the minutes of which . . . .

. . . [state], "Mike Coe explained CEA wanted to keep the current index. There is not a board policy that he is

aware of that prohibits them from giving a bonus because it would not affect the salary index."

The penultimate paragraph . . . says, "Mike Coe explained again that there is no board policy which prevents the board from giving a bonus but that the negotiation team did not endorse or approve of it."

In prior negotiating sessions, had the Board of Education proposed starting salaries of 24,000 or $23,650?

[Dr. Fero:] Prior to Proposal No. 7, which was the . . . final accepted by both sides, there were six offers by the Board . . . and there were six offers made by the CEA. All six . . . offered either above or just under 24. . . .

. . . .

The board made . . . it very clear from the very outs[et] of negotiations that it . . . wanted to have the starting salary at $24,000. . . .

The board . . . wanted to be competitive. . . .

. . . .

. . . And it was discussed upon how can we get to 24 — how can we attract teachers if you're at $21,700 . . . .

And the response was, well, you can't give signing bonuses, we don't approve of it, we don't like it but there's nothing in board policy that prohibits you from doing that.

Q. When you say the response was, who are you referring to? Mr. Coe?

A. Mr. Coe.

. . . .

Q. Then let me ask you to focus on this. You said from the outset. Do you mean from the first negotiating session . . . you raised the issue of Mr. Hintz and the amount of pay that the board had committed to paying him?

. . . .

A. Yes, we did.

. . . .

Q. Okay. Now, you were discussing it at the negotiating session on August 10th of — or August 8th of 2000, the last session? That's the — reflected in the minutes . . . .

A. Correct.

Q. . . . Mr. Coe is listed in these exhibits as saying that there is — he's not aware of any board policy that prohibits the board from giving . . . a signing bonus. What did you understand his statements to mean?

A. That what we had done with Mr. Hintz they did not approve of but they saw no reason why we couldn't do it.

The whole — the whole part up to where [the minutes] says the board asked to caucus, everything was how do we attract teachers into this district, especially in extremely difficult areas to fill.

We discussed this at great length. And they said the CEA said there isn't any problem with giving bonuses. . . .

. . . .

. . . I understood that the — and the board negotiating committee understood that to mean that the CEA was saying its okay to pay bonuses.

The record further shows the CIR considered the course of negotiations in its decision and order. The CIR's order states:

During negotiations, Mike Coe, an Association representative, informed the Board that he knew of no law or Board policy which would prevent the Board from giving teachers bonuses, but that the Association's negotiation team did not endorse or approve bonuses. The District then presented its seventh proposal with a base salary of $21,650 on a 5 x 4 salary schedule. The parties completed negotiations without reaching impasse and without impasse being declared when the Association accepted this proposal, and the parties signed the 2000-2001 collective bargaining agreement on August 14, 2000 . . . .

. . . .

. . . [T]he Association in negotiations with the District clearly stated that while the Association's representative could find no board policy which prevented the district from giving a bonus, the Association did not endorse or approve of such bonuses.

This court has held, "An improper exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection." *Leavitt v. Magid*, 257 Neb. 440, 444-45, 598 N.W.2d 722, 726 (1999). The record shows that

substantial evidence was admitted regarding signing bonuses and its effect on the course of negotiations between the parties. The record further demonstrates that such was considered by the CIR. Therefore, any error by the CIR was not prejudicial to the District and is harmless. The District's second assignment of error is without merit.

### 3. DIRECT DEALING

In its third assignment of error, the District argues the CIR erred in finding that it had engaged in direct dealing in violation of § 48-824(2)(a) and (e). For the sake of completeness, we note that the District makes no specific argument with respect to the CIR's findings (1) that the District's actions were direct dealing in violation of § 48-824(2)(f) or (2) that the District's unilateral actions in paying the signing bonuses violated the collective bargaining agreement and § 48-824(2)(a) and (e). We therefore limit our analysis to the specific arguments of the District. Section 48-824(2)(a) and (e) states:

It is a prohibited practice for any employer or the employer's negotiator to:

(a) Interfere with, restrain, or coerce employees in the exercise of rights granted by the Industrial Relations Act;

. . . .

(e) Refuse to negotiate collectively with representatives of collective-bargaining agents as required by the Industrial Relations Act.

Section 48-824(2)(a) and (e) are similar to § 8(a)(1) and (5) of the NLRA, codified at 29 U.S.C. § 158(a)(1) and (5) (2000). As recognized earlier, we have said that cases decided under the NLRA can be helpful in interpreting the NIRA, but are not binding. See, *Nebraska Pub. Emp. v. Otoe Cty.*, 257 Neb. 50, 595 N.W.2d 237 (1999); *University Police Officers Union v. University of Nebraska*, 203 Neb. 4, 277 N.W.2d 529 (1979). We therefore look to federal decisions interpreting § 8(a)(1) and (5) for guidance.

The District cites *Permanente Medical Group, Inc.*, 332 N.L.R.B. No. 106 (Oct. 31, 2000), as setting forth the appropriate analysis when evaluating a claim of direct dealing. The analysis employed in *Permanente Medical Group, Inc.* has been

applied to labor relations cases by the U.S. Supreme Court. See *Medo Corp. v. Labor Board*, 321 U.S. 678, 64 S. Ct. 830, 88 L. Ed. 1007 (1944). We agree with the District that *Permanente Medical Group, Inc.* provides an appropriate test and proceed to evaluate the District's claim under its holding.

In *Permanente Medical Group, Inc., supra*, the NLRB identifies the elements of direct dealing as follows: (1) The employer was communicating directly with union-represented employees; (2) the discussion was for the purpose of establishing wages, hours, and terms and conditions of employment or undercutting the collective bargaining unit's role in bargaining; and (3) such communication was made to the exclusion of the collective bargaining unit. We will discuss these elements below.

### (a) Dealing With Hintz to Exclusion of CEA

The District first argues that it did not engage in direct dealing with Hintz because direct dealing requires that the collective bargaining agent be excluded, and in this case, it contends, the CEA was not excluded. The CIR's order with respect to this issue found in relevant part:

> [T]he District met with Mr. Hintz and communicated with him directly for the purpose of establishing his wages. This communication was to the exclusion of the Association; the Association had absolutely no input before the District and Mr. Hintz agreed to a salary of $24,000 per year. After the collective bargaining agreement was entered, the District again met with Mr. Hintz on August 30, 2000 to set forth in writing that his annual compensation would total $24,000 . . . .

The CIR found that the District engaged in direct dealing with Hintz on two separate occasions—in April 2000 when Hintz and the District agreed to a contract for $24,000 and on August 30 when Hintz and the District entered into the signing bonus agreement.

### (i) April Actions

Direct dealing occurs when an employer "undercuts" the authority of a collective bargaining agreement by negotiating directly with an individual employee regarding a mandatory subject of bargaining. *Permanente Medical Group, Inc., supra*.

When the District made its initial offer to Hintz in April, he was not an employee of the District; nor is there evidence in the record to suggest that the April negotiations with Hintz would be covered by any other agreement between the District and the CEA. The CIR's finding that the District engaged in direct dealing in April 2000 is not supported by a preponderance of the evidence and is in error.

### (ii) August Actions

The August 30, 2000, communication regarding the signing bonus, however, presents a different factual circumstance. On the date the signing bonus agreement was entered into, Hintz was an employee of the District and subject to the terms of the 2000-2001 negotiated agreement. By communicating with Hintz and thereafter entering into the "bonus" agreement, the District contracted for a different, higher starting salary. As a result, the agreement regarding signing bonuses clearly dealt with Hintz' wages. The CEA was not involved in the signing bonus agreement entered into between the District and Hintz, nor was it officially informed that such an agreement had been made.

The District cites *Toledo Typographical Union No. 63 v. N.L.R.B.*, 907 F.2d 1220, 1222 (D.C. Cir. 1990), for the proposition that "[a]n employer may deal directly with its employees over any lawful matter if it first obtains the consent of their union." This argument presupposes that the negotiations between the CEA and the District resulted in an understanding that signing bonuses could be paid, thus permitting the District to approach individual teachers to negotiate such a bonus. The CIR heard evidence pertaining to signing bonuses and the negotiation process and found that there was no understanding or agreement reached between the parties on that issue. Since we have earlier affirmed such finding, the District's argument that it had the consent of the CEA in that signing bonuses were negotiated, and thus did not act to the exclusion of the CEA, is without merit.

### (b) Signing Bonus as Wage, Hour, or Condition of Employment

The District next argues that it did not engage in direct dealing because a signing bonus is not a wage, hour, or condition of employment. "[W]ages, hours, and other terms and conditions

of employment or any question arising thereunder" are considered to be mandatory subjects of bargaining under the NIRA. See § 48-816(1). The CIR found that the bonus paid to Hintz was part of his wages, and thus a mandatory subject of bargaining.

The District relies on *N. L. R. B. v. Wonder State Manufacturing Company*, 344 F.2d 210 (8th Cir. 1965), to support its contention that bonuses are not the subject of mandatory bargaining. In *Wonder State Manufacturing Company*, the Eighth Circuit found that an employer was permitted to unilaterally withdraw a Christmas bonus over a union objection that the bonus was a subject of mandatory bargaining. The court emphasized that there had been no regularity in the paying of the bonus by the employer, there was no uniformity in how the employer determined the amount of the bonus, the bonus was not tied to the employee's usual remuneration, and whether a bonus was paid was tied to the financial condition and ability of the employer to afford to pay such a bonus. The District contends those same factors are present in this case: "The District had never before paid any type of signing bonus. There was no uniform bonus amount, because this was a one-time situation. Finally, the bonus was paid to Hintz because the District faced an exigency that demanded unique action." Brief for appellant at 27.

However, the court in *N. L. R. B. v. Wonder State Manufacturing Company*, 344 F.2d at 213, explained:

The rule is that gifts per se—payments which do not constitute compensation for services—are not terms and conditions of employment, and an employer can make or decline to make such payments as he pleases, *but if the gifts or bonuses are so tied to the remuneration which employees received for their work that they were in fact a part of it, they are in reality wages and within the statute.*

(Emphasis supplied.) See, also, *N. L. R. B. v. Electric Steam Radiator Corporation*, 321 F.2d 733 (6th Cir. 1963) (containing similar language). In this case, the CIR found that "[a]fter the collective bargaining agreement was entered, the District again met with Mr. Hintz on August 30, 2000 to set forth in writing that his annual compensation would total $24,000, including a 'signing bonus' of $2,350." It is undisputed in the record that the " 'signing bonus' " was to be paid to Hintz in 12 equal installments, the

sum of which, when added to his base salary of $21,650, totaled $24,000. The CIR's finding that the bonus was a wage is, considering the whole record, supported by a preponderance of the competent evidence, is within the scope of the CIR's statutory authority, and is not contrary to law. See, *Nebraska Pub. Emp. v. Otoe Cty.*, 257 Neb. 50, 595 N.W.2d 237 (1999); § 48-825(4). The District's third assignment of error is without merit.

## 4. WAIVER

In its fourth assignment of error, the District asserts that the CEA waived any right to "complain" about the District's paying of a bonus to Hintz due to its failure to comply with the grievance procedure set forth in the negotiated agreement between the parties. The CEA admits that no grievance was filed prior to filing its petition with the CIR.

Article IX of the 2000-2001 negotiated agreement states that "[g]rievances shall be filed and processed according to the procedure outlined in Appendix D." Appendix D defines a grievant as "any teacher, group of teacher [sic], *or* the association filing the grievance" and includes both an informal and formal procedure. See *Pfizer v. Lancaster Cty. Bd. of Equal.*, 260 Neb. 265, 616 N.W.2d 326 (2000) (word "or" when used properly is disjunctive). In accordance with appendix D, the informal procedure is implemented as follows: "a. A *teacher* who has a grievance should first discuss the matter with his or her department chairman, principal, or supervisor to whom he or she is directly responsible in an effort to resolve the problem." (Emphasis supplied.)

The formal procedure as set forth in appendix D states, in part, at B1(a) of appendix D, that

> [i]f an aggrieved person is not satisfied with the disposition of his or her problem, or if no decision has been rendered after seven days through the informal procedure, he or she may submit the claim as a formal grievance, in writing, to the appropriate principal and retain a copy.

Thereafter, at B1(c), it is stated that "[a] *teacher* who is not directly responsible to a . . . principal may submit a form grievance claim to the administrator to whom he or she is directly responsible." (Emphasis supplied.) Finally, under section D2

entitled **"Other Considerations,"** a "written grievance [shall be] filled [sic] within 30 days . . . after the *teacher* knew, or should have known, of the act or condition on which the grievance is based, [or] the grievance shall be waived." (Emphasis supplied.) ▆ Waiver is defined as

> a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right. . . . In order to establish a waiver of a legal right, there must be clear, unequivocal, and decisive action of a party showing such a purpose, or acts amounting to estoppel on his part.

(Citation omitted.) *Wheat Belt Pub. Power Dist. v. Batterman,* 234 Neb. 589, 594, 452 N.W.2d 49, 53 (1990). See, also, *Shelter Ins. Cos. v. Frohlich,* 243 Neb. 111, 498 N.W.2d 74 (1993). The issue is whether the language of the negotiated agreement evidences the CEA's intention to relinquish its right to bring an action in the CIR without first complying with the grievance procedure. We determine that it does not.

First, as noted earlier, in order for the CEA to have waived its right to immediately file its claim in the CIR, such waiver must be "clear, unequivocal, and decisive." The language of appendix D is not clear, unequivocal, or decisive. Although the definition of grievant can include the CEA, the grievance procedure, as set forth in appendix D, by its terms, could be read to limit its application to teachers. See *Pfizer v. Lancaster Cty. Bd. of Equal., supra.* Since the CEA is not a teacher, it is not "clear [and] unequivocal" that the CEA must also follow such procedures as a condition precedent to filing an action in the CIR. See *Wheat Belt Pub. Power Dist. v. Batterman, supra.*

Furthermore, to effectuate a waiver, the relinquishment must be "voluntary and intentional" and must be of a "known existing legal right." See *id.* The language of the negotiated agreement makes no mention of the CIR or the NIRA. As the CIR noted in its decision:

> The grievance procedure provides that if a grievance is not filed within 30 days after the grievant has knowledge of the alleged wrongful act, then the grievance shall be waived. This, however, does not specifically waive the statutory right to bring a case before the Commission. The Association has

a statutory right to file a prohibited practice case, and its non-filing of a grievance does not waive that right.

We agree with the CIR's finding and determine that the CEA did not waive its statutory right to file a claim with the CIR when it did not file a grievance. The CIR's finding to that effect is not contrary to law. The District's fourth assignment of error is without merit.

### 5. STATUTORY AUTHORITY

In its fifth and final assignment of error, the District asserts that the CIR's entry of "[d]eclaratory and injunctive relief in this case exceeds the Commission's limited statutory authority, and is, therefore, contrary to law." In its brief, the District appears to argue that the orders entered by the CIR exceeded its authority for two reasons. First, the remedies ordered grant declaratory and injunctive relief; second, the orders provide neither adequate nor appropriate remedies pursuant to §§ 48-819.01 and 48-825(2). We will discuss each separately.

In its decision, the CIR ordered the District, restated and summarized, to cease and desist from (1) deviating from the negotiated agreement in payment of salaries and benefits; (2) paying Hintz in deviation from the negotiated agreement after August 1, 2001; (3) bypassing the CEA and dealing directly with its represented employees regarding wages, terms, and conditions of employment; and (4) paying teachers "'signing bonuses'" or other compensation that is a mandatory subject of bargaining and is not included in a negotiated agreement. The CIR further ordered the District to post notices informing employees that it had engaged in prohibited labor practices.

The CIR does not have authority to grant declaratory or equitable relief. See, *Calabro v. City of Omaha*, 247 Neb. 955, 531 N.W.2d 541 (1995); *Transport Workers of America v. Transit Auth. of City of Omaha*, 205 Neb. 26, 286 N.W.2d 102 (1979). Furthermore, this court has noted that the CIR is an administrative body performing a legislative function. *Transport Workers of America v. Transit Auth. of City of Omaha, supra*. Thus, it has only those powers delineated by statute, *Jolly v. State*, 252 Neb. 289, 562 N.W.2d 61 (1997), and should "exercise that jurisdiction in as narrow a manner as may be necessary," *University Police*

*Officers Union v. University of Nebraska,* 203 Neb. 4, 18, 277 N.W.2d 529, 537 (1979).

In its petition, the CEA did not request declaratory relief. The CEA's petition alleged the existence of a pending dispute, namely whether the District engaged in prohibited labor practices by paying Hintz a bonus contrary to the 2000-2001 negotiated agreement. In *Ryder Truck Rental v. Rollins,* 246 Neb. 250, 257, 518 N.W.2d 124, 128 (1994), we observed that "[t]he function of a declaratory judgment is to determine justiciable controversies which either are not yet ripe for adjudication by conventional forms of remedy or, for other reasons, are not conveniently amenable to the usual remedies." In this case, the CIR was confronted with a pending dispute. Its order did not grant declaratory relief.

Nor did the Commission's orders, despite any similarity in language, grant equitable or injunctive relief. Injunctive relief is generally preventative, prohibitory, or protective. *Putnam v. Fortenberry,* 256 Neb. 266, 589 N.W.2d 838 (1999). Black's Law Dictionary 784 (6th ed. 1990) defines injunction as follows:

> A court order prohibiting someone from doing some specified act or commanding someone to undo some wrong or injury. A prohibitive, equitable remedy issued . . . by a court . . . directed to a party . . . forbidding the latter from doing some act . . . or restraining him in the continuance thereof . . . . A judicial process . . . requiring [a] person to whom it is directed to do or refrain from doing a particular thing.

The CIR is not a court, but an administrative body performing a legislative function. *Transport Workers of America v. Transit Auth. of City of Omaha, supra.* Its orders are not issued by a court and are merely advisory, given the CIR has no enforcement authority. The enforcement of any order issued by the CIR resides only in the district courts of this state. See §§ 48-819 (failure on part of any person to obey order of CIR shall constitute contempt, and upon application to appropriate district court, shall be dealt with as would similar contempt of said district court) and 48-825(2) (upon finding that party has committed prohibited practice, any remedy ordered by CIR can be enforced by district court only upon filing of action seeking injunctive relief).

The orders issued by the CIR in this case did not command, forbid, or restrain the District. They were not issued by a court, are merely advisory, and therefore, do not grant injunctive relief.

Having concluded that the orders of the CIR provided neither declaratory nor injunctive relief, we now consider whether they were "adequate" and "appropriate" remedies pursuant to §§ 48-819.01 and 48-825(2).

The remedies fashioned by the CIR essentially fall into two categories. The first category, identified above in Nos. (1) through (4), ordered the District to cease and desist from certain actions. The second category ordered the District to post notices informing employees that it had engaged in prohibited labor practices. We will discuss each category separately.

Section 48-825(2) authorizes the CIR, upon a finding that a party has committed a prohibited practice, to "order an appropriate remedy." The District argues that the cease and desist orders are not appropriate and therefore contrary to law.

What is considered an appropriate remedy pursuant to § 48-825(2) is an issue of first impression. However, § 48-819.01 contains remedial language similar to § 48-825(2). Section 48-819.01 provides:

Whenever it is alleged that a party to an industrial dispute has engaged in an act which is in violation of any of the provisions of the Industrial Relations Act, or which interferes with, restrains, or coerces employees in the exercise of the rights provided in such act, the commission shall have the power and authority to make such findings and to enter such temporary or permanent orders as the commission may find necessary *to provide adequate remedies* to the injured party or parties, to effectuate the public policy enunciated in section 48-802, and to resolve the dispute.

(Emphasis supplied.) We therefore look to § 48-819.01 to aid us in determining what are appropriate remedies under § 48-825(2).

In *Transport Workers v. Transit Auth. of Omaha*, 216 Neb. 455, 344 N.W.2d 459 (1984), this court was presented with the issue of whether the CIR had the authority to enter temporary orders concerning wages, hours, and terms and conditions of employment while the CIR was attempting to resolve a labor dispute pending before it. Relying in part upon the version of

§ 48-819.01 then in effect, which is substantially similar to the current § 48-819.01, we observed:

> To be sure, the authority of the CIR to enter temporary orders is not unlimited. As we noted in *University Police Officers Union v. University of Nebraska, supra* at 18, 277 N.W.2d at 537: "We will not now attempt to enumerate all the possible circumstances under which the CIR may exercise its authority. We do note, however, that the authority granted to the CIR under the present act in general and section 48-816, R.R.S. 1943, in particular, is limited in nature. We would anticipate that the CIR will exercise that jurisdiction in as narrow a manner as may be necessary." The authority does, however, appear to be sufficient in this case. To hold otherwise would be to completely repeal §§ 48-816 and 48-819.01 by judicial fiat.

*Transport Workers v. Transit Auth. of Omaha*, 216 Neb. at 460, 344 N.W.2d at 463.

Having found violations of the NIRA, §§ 48-819.01 and 48-825(2) grant the CIR authority to issue such orders as it may find necessary to provide adequate remedies to the parties to effectuate the public policy enunciated in § 48-802. This court has previously commented upon the authority of the CIR to issue cease and desist orders. In *University Police Officers Union v. University of Nebraska*, 203 Neb. 4, 16-17, 277 N.W.2d 529, 537 (1979), we discussed § 48-811 and observed:

> The provisions of section 48-811, R. R. S. 1943, do not constitute matters similar to those prescribed in sections 8a and 8b of the NLRA. Thus, the CIR does not, by reason of section 48-811, R. R. S. 1943, have authority to declare unfair labor practices. If, in fact, the evidence discloses that a public employer is threatening or harassing an employee because of any petition filing by such employee, the CIR is limited to entering an order directing the employer to cease and desist such threat or harassment. The CIR has no authority, however, to require anything further. Upon failure of the public employer to cease and desist, action must be brought by the employee in the appropriate District Court seeking to hold the public employer guilty of contempt of court.

In our view, the remedies provided by the CIR are nothing more than the CIR's ordering the District to cease and desist violating the terms of the negotiated agreement and are one of the "'circumstances under which the CIR may exercise its authority.'" *Transport Workers v. Transit Auth. of Omaha,* 216 Neb. at 460, 344 N.W.2d at 463. To prohibit the CIR from issuing such relief under these circumstances would be to repeal §§ 48-819.01 and 48-825(2) "by judicial fiat." *Id.*

Having concluded that the cease and desist orders issued by the CIR were "adequate" and "appropriate" under §§ 48-819.01 and 48-825(2), we now determine whether the CIR's order requiring the posting of notices was an "adequate" and "appropriate" remedy under these facts.

The District, in arguing that the CIR has no such authority, relies in part upon *University Police Officers Union v. University of Nebraska,* 203 Neb. at 17, 277 N.W.2d at 537, wherein this court stated:

> We note that the CIR directed UNL to post a copy of its temporary order, and in its opinion of December 20, 1977, suggested it was considering requiring UNL to post "mea culpa" notices. The CIR is without authority to make such orders. Its authority is limited to the provisions of section 48-818, R. R. S. 1943, wherein it is provided that the CIR's findings and orders may establish or alter the scale of wages, hours of labor, or conditions of employment.

However, *University Police Officers Union* was decided prior to the enactment of §§ 48-819.01 and 48-825. We therefore consider the CIR's authority to require the posting of notices within the statutory framework of identifying "adequate" and "appropriate" remedies.

In this case, it is difficult to envision how the posting of notices provides an adequate and appropriate remedy to the CEA. The CEA's grievances were remedied by the CIR's finding that the District had engaged in prohibited labor practices and its issuance of the cease and desist orders. Clearly, those remedies are adequate to resolve the dispute.

Furthermore, the mere posting of these notices does not appear to effectuate the public policy underlying the NIRA. That policy provides that

> [t]he continuous, uninterrupted and proper functioning and operation of governmental service . . . to the people of Nebraska are hereby declared to be essential to their welfare, health and safety. It is contrary to the public policy of the state to permit any substantial impairment or suspension of the operation of governmental service . . . . It is the duty of the State of Nebraska to exercise all available means and every power at its command to prevent the same so as to protect its citizens from any dangers, perils, calamities, or catastrophes which would result therefrom.

§ 48-802(1). Under these facts, we fail to see any relationship between the policy stated in § 48-802 and the posting of notices relating to the employer's engagement in prohibited labor practices under the NIRA.

Accordingly, we determine that ordering the District to post notices regarding its NIRA violation is, under the facts, not a proper remedy and therefore in excess of the CIR's powers. Such order is reversed.

Finally, the District argues that if § 48-819.01 gives the CIR the authority to issue declaratory and injunctive relief, then § 48-819.01 is unconstitutional as granting powers in violation of the Constitution of the State of Nebraska. However, we need not reach that issue, having determined that in this case, the CIR did not order such relief.

## VI. CONCLUSION

The CIR's order is affirmed insofar as it (1) found that the District engaged in prohibited labor practices; (2) ordered the District to cease and desist from deviating from the negotiated agreement in payment of salaries and benefits; (3) ordered the District to cease and desist from paying Hintz in deviation from the negotiated agreement after August 1, 2001; (4) ordered the District to cease and desist from bypassing the CEA and dealing directly with its represented employees regarding wages, terms, and conditions of employment; and (5) ordered the District to cease and desist from paying teachers signing bonuses or other compensation that is a mandatory subject of bargaining and which is not included in a negotiated agreement.

The CIR's order is reversed insofar as it (1) found that the District engaged in prohibited labor practices in communicating with Hintz in April 2000 and (2) ordered the District to post notices regarding its violation of the negotiated agreement.

AFFIRMED IN PART, AND IN PART REVERSED.